| UNITED STATES DISTRICT COURT | EASTERN DISTRICT OF TEXAS |
|---|---|

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| *versus* § | CASE NO. 4:15-CR-163(1) |
| § | |
| ALEJANDRO CASTILLO SERRATO § | |

## MEMORANDUM AND ORDER

Pending before the court is Defendant Alejandro Castillo Serrato's ("Serrato") Motion Seeking Compassionate Release (#338), wherein he requests that the court reduce his term of imprisonment to time served pursuant to 18 U.S.C. § 3582(c)(1)(A), due to the threat of Coronavirus Disease 2019 ("COVID-19"). The Government opposes the motion, and after conducting an investigation, United States Probation and Pretrial Services ("Probation") recommends denying the motion. Having considered the motion, the Government's response, Probation's recommendation, the record, and the applicable law, the court is of the opinion that the motion should be denied.

I.      Background

On January 28, 2016, Serrato pleaded guilty pursuant to a binding plea agreement to Count I of the Indictment charging him with Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h), and Count VIII of the Indictment charging him with Conspiracy to Possess with the Intent to Distribute and Distribution of Marijuana and Cocaine, in violation of 21 U.S.C. § 846. On October 5, 2016, the court sentenced Serrato to 240 months' imprisonment as to Count I and 240 months' imprisonment as to Count VIII, followed by a 3-year term of supervised release for Count I and a five-year term of supervised release for Count VIII, all such sentences to run

concurrently. Serrato is currently housed at the Federal Correctional Institution Seagoville, located in Seagoville, Texas ("FCI Seagoville"). His projected release date is October 7, 2032.

II.     Analysis

On December 21, 2018, the President signed the First Step Act of 2018 into law. *See* First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194. The Act, in part, amended 18 U.S.C. § 3582(c), which gives the court discretion, in certain circumstances, to reduce a defendant's term of imprisonment:

> The court, upon motion of the Director of the Bureau of Prisons ("BOP"), or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that extraordinary and compelling reasons warrant such a reduction; or the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [BOP] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g); and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A). This provision is commonly referred to as "compassionate release."

Prior to the First Step Act, only the Director of the BOP could file a motion seeking compassionate release. *See United States v. Franco*, No. 20-60473, 2020 WL 5249369, at *1 (5th Cir. Sept. 3, 2020) ("Prior to the passage of the First Step Act . . . courts lacked the power to adjudicate motions for compassionate release."); *Tuozzo v. Shartle*, No. 13-4897, 2014 WL 806450, at *2 (D.N.J. Feb. 27, 2014) (denying petitioner's motion for compassionate release because no motion for his release was filed by the BOP); *Slate v. United States*, No. 5:09-CV-

00064, 2009 WL 1073640, at *3 (S.D.W.Va. Apr. 21, 2009) ("Absent a motion from the BOP, the Court lacks authority to grant compassionate release."). The First Step Act amended § 3582(c) by providing a defendant the means to appeal the BOP's decision not to file a motion for compassionate release on the defendant's behalf. *United States v. Cantu*, 423 F. Supp. 3d 345, 347 (S.D. Tex. 2019); *United States v. Bell*, No. 3:93-CR-302-M, 2019 WL 1531859, at *1 (N.D. Tex. Apr. 9, 2019). The plain language of the statute, however, makes it clear that the court may not grant a defendant's motion for compassionate release unless the defendant has complied with the administrative exhaustion requirement. 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, 960 F.3d 831, 833 (6th Cir. 2020) ("Even though [the] exhaustion requirement does not implicate [the court's] subject-matter jurisdiction, it remains a mandatory condition."); *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he exhaustion requirement . . . presents a glaring roadblock foreclosing compassionate release."). Thus, before seeking relief from the court, a defendant must first submit a request to the warden of his facility to move for compassionate release on his behalf and then either exhaust his administrative remedies or wait for the lapse of 30 days after the warden received the request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Harris*, No. 20-1723, 2020 WL 4048690, at *1 (3d Cir. July 20, 2020); *United States v. Springer*, No. 20-5000, 2020 WL 3989451, at *3 (10th Cir. July 15, 2020) (defendant "was required to request that the BOP file a compassionate-release motion on his behalf to initiate his administrative remedies" (citing *Raia*, 954 F.3d at 595)); *Alam*, 960 F.3d at 833-34; *United States v. Soliz*, No. 2:16-190-3, 2020 WL 2500127, at *3 (S.D. Tex. May 14, 2020) ("§ 3582(c)(1)(A) does not provide this Court with the equitable authority to excuse [defendant's]

failure to exhaust his administrative remedies or to waive the 30-day waiting period." (quoting *United States v. Reeves*, No. 18-00294, 2020 WL 1816496, at *2 (W.D. La. Apr. 9, 2020))).

According to his motion, Serrato submitted a request with the warden of FCI Seagoville to be reviewed by "the Warden's Compassionate Release Review Committee." He claims his request was unsuccessful. He offers no proof to support his claim, and the BOP has no record of receiving a request for reduction in sentence from Serrato. Probation reports, however, that Serrato's case was reviewed by BOP officials for COVID-19 home confinement placement, which was denied on April 16, 2020. The court is without authority to waive the exhaustion of administrative remedies or the 30-day waiting period. *See Franco*, 2020 WL 5249369, at *2 ("Congress has commanded that a 'court *may not* modify a term of imprisonment' if a defendant has not filed a request with the BOP."); *Alam*, 960 F.3d at 832 ("[B]ecause this exhaustion requirement serves valuable purposes (there is no other way to ensure an orderly processing of applications for early release) and because it is mandatory (there is no exception for some compassionate-release requests over others), we must enforce it."); *United States v. Garcia*, No. CR 2:18-1337, 2020 WL 3000528, at *3 (S.D. Tex. June 2, 2020) ("While the Court sympathizes with Defendant's plight, because he has failed to comply with the exhaustion requirements under § 3582, his motion is not ripe for review, and the Court is without jurisdiction to grant it."); *United States v. Garcia-Mora*, No. CR 18-00290-01, 2020 WL 2404912, at *2 (W.D. La. May 12, 2020) ("Section 3582(c)(1)(A) does not provide [the court] with the equitable authority to excuse [the defendant's] failure to exhaust his administrative remedies or to waive the 30-day waiting period."); *United States v. Collins*, No. CR 04-50170-04, 2020 WL 1929844, at *2 (W.D. La. Apr. 20, 2020); *see also Ross v. Blake*, ___ U.S. ___, 136 S. Ct. 1850, 1857 (2016)

4

("[J]udge-made exhaustion doctrines . . . remain amenable to judge-made exceptions," whereas "mandatory exhaustion statutes . . . establish mandatory exhaustion regimes, foreclosing judicial discretion."). Accordingly, at this time, the court does not have the authority to grant the relief Serrato requests. Even if Serrato had complied with the exhaustion requirement before filing the instant motion, nothing in his motion indicates that extraordinary and compelling reasons exist to modify his term of imprisonment to release him from confinement.

Congress did not define "extraordinary and compelling." Rather, it elected to delegate its authority to the United States Sentencing Commission ("the Commission"). *See* 28 U.S.C. § 994(t) ("The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."); *see also* U.S. SENTENCING GUIDELINES MANUAL § 1B1.13 (U.S. SENTENCING COMM'N 2018) ("USSG"). In Application Note 1 to § 1B1.13 of the USSG, the Commission defined "extraordinary and compelling reasons" to include the following four categories of circumstances: (i) certain medical conditions of the defendant; (ii) the defendant is 65 years or older and meets other requirements; (iii) the defendant's family has specified needs for a caregiver; and (iv) other reasons in the defendant's case that establish an extraordinary and compelling reason. The court must also consider the factors set forth in 18

U.S.C. § 3553(a),[1] as applicable, and find that the sentence modification is consistent with the policy statements issued by the Commission. 18 U.S.C § 3582(c)(1)(A). The policy statement regarding compassionate release requires a determination that "the defendant is not a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2).

In the instant motion, Serrato contends that he is eligible for compassionate release due to his medical conditions, specifically that he "is designated 'chronic care' with Diabetes, Hypertension, and High Cholesterol." The USSG provides that extraordinary and compelling reasons exist regarding a defendant's medical condition when the defendant is "suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory)" or when a defendant is "suffering from a serious physical or medical condition," "suffering from a serious functional or cognitive impairment," or "experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." *Id*. § 1B1.13 cmt. n.1(A).

Here, Serrato, age 46, provides limited medical records to support his claimed diagnoses. According to Serrato's Presentence Investigation Report ("PSR"), prepared in 2016, he informed Probation that he was diagnosed with non-insulin diabetes, two hernias, and kidney stones by one

---

[1]Section 3553(a) directs courts to consider: the nature and circumstances of the offense and the defendant's history and characteristics; the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need to deter criminal conduct; the need to protect the public; the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences and sentencing ranges established for defendants with similar characteristics under applicable USSG provisions and policy statements; any pertinent policy statement of the Commission in effect on the date of sentencing; the need to avoid unwarranted disparities among similar defendants; and the need to provide restitution to the victim. 18 U.S.C. § 3553(a).

doctor and prostatitis by another doctor.  Serrato used an alias when seeking treatment from both doctors; therefore, no medical records were found under his legal name.  Probation's investigation revealed, and his medical records confirm, that BOP officials classify him at Care Level 2 "as a stable, chronic care inmate."  Further, Probation reports that "[w]hile the medical issues reported by Mr. Serrato are legitimate, the BOP has determined him to be medically stable at this time."  Serrato's BOP medical records indicate that on January 21, 2020, Serrato was seen by G. Mateware, M.D., who confirmed that he has Type 2 diabetes mellitus, but noted that Serrato's diabetes was in "poor control" because "[p]atient [was] noncompliant."  According to the records, Serrato stated that until recently, he was not taking his Metformin because it made him sick.  He is not insulin-dependent.  A lab report dated January 15, 2020, reveals that Serrato's glucose level was high.  Dr. Mateware also noted that Serrato was noncompliant with caring for his hyperlipidemia, although he was prescribed Atorvastatin.  As for his elevated blood pressure, the doctor placed him on 10 Mg of Lisinopril.  The medication apparently worked, as his blood pressure was reduced from 140/87 on January 13, 2020, to 120/60 on April 10, 2020.  The provider described the April 10, 2020, encounter as a "general adult medical exam without abnormal findings."

On July 14, 2020, Serrato tested positive for COVID-19 and was placed in isolation.  By July 31, 2020, he had met the CDC criteria for release from isolation.  Serrato's medical provider, a nurse practitioner, noted that he "is not severely immunocompromised and did not have a severe illness requiring hospitalization."  Furthermore, Serrato appears to have experienced an asymptomatic case of COVID-19.  Thus, Serrato's medical conditions, including his diabetes, high blood pressure, high cholesterol, and recovery from COVID-19, do not meet the criteria listed

above.  None of these medical conditions is terminal or substantially diminishes his ability to provide self-care.  In fact, Serrato has no medical restrictions, has regular duty work assignments, and is cleared for food service.  He was most recently assigned to an electric work detail.  Accordingly, Serrato has failed to establish that a qualifying medical condition exists that would constitute extraordinary and compelling reasons to reduce his sentence.

Further, "compassionate release is discretionary, not mandatory, and [may] be refused after weighing the sentencing factors of 18 U.S.C. § 3553(a)." *United States v. Chambliss*, 948 F.3d 691, 693 (5th Cir. 2020).  Where, as here, Serrato has engaged in "severe" criminal conduct, the district court has discretion to deny compassionate release after weighing the evidence.  *Id*. at 693-94.  Moreover, granting Serrato compassionate release would fail to provide just punishment for his offense and promote respect for the law.  In *Chambliss*, the United States Court of Appeals for the Fifth Circuit found that the district court did not abuse its discretion in denying compassionate release to a defendant due to the defendant's not yet having served a significant portion of his sentence.  *Id*. at 694.  The district court determined that the defendant's terminal illness "constitut[ed] 'an extraordinary and compelling reason for a sentence reduction' and that he '[did] not present a danger upon release,'" but denied release because "releasing [the defendant] after serving only 14 years of a 30-year sentence minimizes both the impact of [the defendant's] crime and seriousness of the offense." *Id*. at 693-94.  "Moreover, the [district] court, citing the § 3553(a) factors, determined that requiring [the defendant] to serve the remainder of his sentence would 'provide just punishment for the offense' and 'afford adequate deterrence to criminal conduct.'"  *Id*.  In the instant case, releasing Serrato after serving only 60 months

(approximately 25%) of his 240-month sentence would similarly minimize the impact of his crime and the seriousness of his offense.

Although the USSG acknowledges that extraordinary and compelling reasons may exist with respect to a defendant's family circumstances, it specifies the following qualifying conditions: (i) "[t]he death or incapacitation of the caregiver of the defendant's minor child or minor children" or (ii) "[t]he incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner." U.S.S.G. § 1B1.13 cmt. n.1(C)(i)-(ii). Here, Serrato claims he has dependents who "require his physical, financial, emotional, and administrative support, and who suffer as a result of his incarceration away from home." Serrato has proffered no evidence in support of his assertion, and he makes no effort to demonstrate a change in circumstances that necessitates his presence. He does not allege the incapacitation of his spouse or a caregiver of his spouse, and according to his PSR, all four of his children are now likely over age 18, and, in any event, he had no contact with his twin boys, then approximately age 18 or 19, at the time of his prosecution. Therefore, Serrato has not met his burden of proving extraordinary and compelling reasons based on his family circumstances.

Serrato's request for compassionate release potentially falls into the fourth, catch-all category of "other" extraordinary and compelling reasons, which specifically states that the Director of the BOP shall determine whether "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 cmt. n.1(D). Although Subdivision D is reserved to the BOP Director, the Commission acknowledged, even before the passage of the First Step Act, that courts are in the position to determine whether extraordinary and compelling circumstances are

present. *United States v. Beck*, 425 F. Supp. 3d 573, 583 (M.D.N.C. 2019) ("Read in light of the First Step Act, it is consistent with the previous policy statement and with the Commission guidance more generally for courts to exercise similar discretion as that previously reserved to the BOP Director in evaluating motions by defendants for compassionate release."); *see Cantu*, 423 F. Supp. 3d at 352 ("[T]he correct interpretation of § 3582(c)(1)(A) . . . is that when a defendant brings a motion for a sentence reduction under the amended provision, the Court can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C) warrant granting relief.").

In the case at bar, there is no indication that the BOP Director made a determination regarding the presence of extraordinary and compelling reasons with respect to Serrato for any "other" reason. In exercising its discretion, the court, likewise, finds that no extraordinary and compelling reasons exist in relation to Serrato's situation. Serrato expresses concern regarding the spread of COVID-19 among the prison population. Nevertheless, as of September 23, 2020, the figures available at www.bop.gov list 9 inmates and 1 staff member at FCI Seagoville who have confirmed positive cases of COVID-19, 1,307 inmates and 29 staff members who have recovered, and 4 inmates who have succumbed to the disease. FCI Seagoville's elevated number of COVID-19 cases stems from its status as a quarantine site for the BOP. According to Probation's report, FCI Seagoville is one of 25 facilities serving as a quarantine site in the United States. New inmates to the BOP system are sent first to the quarantine sites where they are tested for COVID-19 and monitored for 14 days. Inmates who test positive for COVID-19 are placed in a quarantine-designated area. After testing negative for COVID-19 at the end of their quarantine period, the inmates are then sent to their designated facility.

Indeed, according to Serrato's medical records, he tested positive for the disease, was placed in isolation, and has now recovered from the virus. Thus, it appears that the facility where Serrato is housed is handling the outbreak appropriately and providing adequate medical care. Courts have repeatedly denied COVID-19-based motions for compassionate release filed by inmates who have already contracted and recovered from the virus. *See*, *e.g.*, *United States v. Stockman*, No. H-17-116-2, 2020 WL 5269756, at *3 (S.D. Tex. Aug. 26, 2020) (noting that when an inmate is infected and recovers from COVID-19, the courts have found the risks of infection or severe symptoms or effects because of underlying conditions change and diminish); *United States v. Baker*, No. CR 16-179, 2020 WL 4584195, at *4 (E.D. La. Aug. 10, 2020) ("Courts have denied COVID-19-based motions for compassionate release filed by inmates who have already contracted the virus."); *United States v. Neal*, No. CR 11-28, 2020 WL 4334792, at *1 (E.D. La. July 28, 2020) ("Courts have repeatedly found that defendants who contract COVID-19 and recover are not among those who fall within the guidelines or demonstrate 'extraordinary and compelling reasons,' meriting a reduction in their sentence."); *United States v. Gallegos*, No. 4:17-CR-568, 2020 WL 3403032, at *3 (S.D. Tex. June 19, 2020) ("Having already contracted and fully recovered from COVID-19, the Court cannot say that Defendant's asthma 'substantially diminishes [his] ability . . . to provide self-care within the environment of a correctional facility.'" (quoting U.S.S.G. § 1B1.13)).

Although Serrato expresses legitimate concerns regarding COVID-19, he does not establish that the BOP cannot manage the outbreak within his correctional facility or that the facility is specifically unable to treat Serrato, if he were to contract the virus for a second time, while incarcerated. *See Raia*, 954 F.3d at 597 ("[T]he mere existence of COVID-19 in society and the

possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread."); *United States v. Vasquez*, No. CR 2:18-1282-S-1, 2020 WL 3000709, at *3 (S.D. Tex. June 2, 2020) ("General concerns about the spread of COVID-19 or the mere fear of contracting an illness in prison are insufficient grounds to establish the extraordinary and compelling reasons necessary to reduce a sentence." (quoting *United States v. Koons*, No. 16-214-05, 2020 WL 1940570, at *5 (W.D. La. Apr. 21, 2020))); *United States v. Clark*, No. CR 17-85-SDD-RLB, 2020 WL 1557397, at *5 (M.D. La. Apr. 1, 2020) (finding the defendant had failed to present extraordinary and compelling reasons to modify his prison sentence because he "does not meet any of the criteria set forth by the statute" and he "cites no authority for the proposition that the fear of contracting a communicable disease warrants a sentence modification"). Furthermore, contracting the virus while incarcerated, even in conjunction with preexisting health conditions, is insufficient to establish exceptional and compelling circumstances warranting compassionate release. *See United States v. Jackson*, No. 3:16-CR-196-L-1, 2020 WL 4365633, at *2 (N.D. Tex. July 30, 2020) (finding that defendant had failed to present extraordinary and compelling reasons for compassionate release despite suffering from previous underlying health conditions and testing positive for COVID-19). Accordingly, Serrato has failed to establish that a qualifying medical condition or other reasons exist that would constitute extraordinary and compelling reasons to warrant his release from imprisonment.

The court further finds that compassionate release is not warranted in light of the applicable factors set forth in § 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A) (requiring courts to consider the § 3553(a) factors before granting compassionate release); *Chambliss*, 948 F.3d at 693-94.

Serrato's convictions stem from his role as an organizer and leader of a drug trafficking organization that imported and distributed marijuana and cocaine in the Dallas, Texas, area, as well as engaged in money laundering. Serrato imported marijuana and cocaine into the United States from a source of supply in Mexico from 2006 until his arrest in 2015. During this time, Serrato rented and controlled a warehouse in Dallas, which he used to receive marijuana shipments that were subsequently distributed in the Dallas area, as well as in Illinois and North Carolina. He also purchased at least 60 kilograms of cocaine from a coconspirator, which he then sold to another coconspirator. Serrato supervised the transport of between $400,000.00 and $500,000.00 in drug proceeds every 2 weeks for a total of between $19 and $52 million in drug proceeds between 2011 and 2015. Serrato and his coconspirators would conceal the currency during transport in spare tires, behind speakers, and in secret compartments of the vehicles. Serrato's money laundering scheme centered on the acquisition of real estate, luxury vehicles, race horses, personal watercraft, and other items valued at over $1,700,000.00 using profits from his drug trafficking activities.

After one of his coconspirator's arrest in 2009, Serrato fled to Monterrey, Mexico, where he continued to manage the operations of his drug trafficking organization. After a brief period during which he was reportedly held captive by the Los Zetas drug cartel in 2010, Serrato returned to the United States where he resumed his drug trafficking activities. On four separate occasions between 2009 and 2013, law enforcement discovered 6,329 pounds of marijuana in seizures directly tied to Serrato. In total, Serrato was held responsible for the purchase, transportation, and delivery of 73,940 pounds (33,538.62 kilograms) of marijuana and 60 kilograms of cocaine. The offense also included a firearm, a semi-automatic pistol, which was found during the search of his

residence along with $209,296.00 in drug proceeds and a drug ledger. Although Serrato reported a limited history of drug use when interviewed during the preparation of the PSR, his medical records reflect diagnoses of severe alcohol disorder, severe cannabis use disorder, and severe stimulant related disorder: cocaine. Other BOP records indicate, however, that he failed to complete the residential drug treatment program due to his withdrawal and that he completed no drug education courses. In view of the nature and circumstances surrounding his offenses of conviction and his minimization of his substance abuse problems, the court cannot conclude that Serrato would not pose a danger to any other person or to the community, if released from prison.

Moreover, the BOP has instituted a comprehensive management approach that includes screening, testing, appropriate treatment, prevention, education, and infection control measures in response to COVID-19. In response to a directive from the United States Attorney General in March 2020, the BOP immediately began reviewing all inmates who have COVID-19 risk factors, as described by the Centers for Disease Control and Prevention, for the purpose of determining which inmates are suitable for placement on home confinement. *See Collins*, 2020 WL 1929844, at *3. The BOP notes that inmates need not apply to be considered for home confinement, as this is being done automatically by case management staff. To date, the BOP has placed 7,666 inmates on home confinement. The March 2020 directive is limited to "eligible at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities." *United States v. Castillo*, No. CR 2:13-852-1, 2020 WL 3000799, at *3 (S.D. Tex. June 2, 2020). The BOP has the exclusive authority to determine where a prisoner is housed; thus, the court is without authority to order home confinement. 18 U.S.C. § 3621(b); *Castillo*, 2020 WL 3000799, at *3; *see United States*

*v. Miller*, No. 2:17-CR-015-D (02), 2020 WL 2514887, at *1 (N.D. Tex. May 15, 2020) ("[N]either the CARES Act nor the First Step Act authorizes the court to release an inmate to home confinement.").

In his Memorandum to the BOP dated March 26, 2020, Attorney General Barr acknowledges that the Department of Justice ("DOJ") has an obligation to protect both BOP personnel and inmates. He also notes that the DOJ has the responsibility of protecting the public, meaning that "we cannot take any risk of transferring inmates to home confinement that will contribute to the spread of COVID-19 or put the public at risk in other ways." The Attorney General issued a subsequent Memorandum to the BOP on April 3, 2020, in which he emphasizes that police officers protecting the public face an increased risk from COVID-19 and cannot avoid exposure to the virus, with their numbers dwindling as officers who contract the virus become ill or die or need to recover or quarantine to avoid spreading the disease. Accordingly, he cautions:

> The last thing our massively over-burdened police forces need right now is the indiscriminate release of thousands of prisoners onto the streets without any verification that those prisoners will follow the laws when they are released, that they have a safe place to go where they will not be mingling with their old criminal associates, and that they will not return to their old ways as soon as they walk through the prison gates.

As the court noted in *United States v. Preston*, "[t]he best predictor of how [Defendant] will behave if he were to be released is how he behaved in the past, and his track record is a poor one." No. 3:18-CR-307-K, 2020 WL 1819888, at *4 (N.D. Tex. Apr. 11, 2020) (quoting *United States v. Martin*, No. PWG-19-140-13, 2020 WL 1274857, at *3 (D. Md. Mar. 17, 2020)). Here, Serrato's track record is similarly a poor one.

In short, Serrato has failed to satisfy his burden of showing the necessary circumstances to warrant relief under the statutory framework to which the court must adhere. *See United States*

15

*v. Dodge*, No. 17-323-01, 2020 WL 3668765, at *5 (W.D. La. July 6, 2020) (stressing that "the rampant spread of the coronavirus and the conditions of confinement in jail, alone, are not sufficient grounds to justify a finding of extraordinary and compelling circumstances"); *Koons*, 2020 WL 1940570, at *4-5 (same). As the court observed in *Koons*, rejecting the notion that it has "carte blanche" authority to release whomever it chooses, "[t]he Court cannot release every prisoner at risk of contracting COVID-19 because the Court would then be obligated to release every prisoner." *Dodge*, 2020 WL 3668765, at *6; *Koons*, 2020 WL 1940570, at *5.

III.   Conclusion

Consistent with the foregoing analysis, Serrato's Motion Seeking Compassionate Release (#338) is DENIED.

SIGNED at Beaumont, Texas, this 24th day of September, 2020.

_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE